Case No. 18-5350 Duane Johnson v. E. D. Wilson Miss Sterling for the affidavits, Miss Green for the evidence Good morning, and may it please the Court. My name is Amanda Sterling, and I represent the appellant, Duane Joseph Johnson, as pro bono counsel. If I may, I would like to reserve three minutes of my time for a moment. The record in this case is clear. Mr. Johnson was deprived of his constitutional right to the effective assistance of counsel on direct appeal from his convictions. Mr. Johnson was sentenced to 51 years to life in prison, almost 25 years ago at the age of 17. His convictions were affirmed by the D.C. Court of Appeals shortly thereafter. Mr. Johnson did not know at the time, and did not learn until many years later, that his counsel at trial and on direct appeal had previously represented Victor Williams, a critically important government witness who testified against Mr. Johnson, who is the most central figure to the defense theory of the case, and who, on the defense theory, would be guilty of felony murder. Mr. Sullivan claims that he never discovered the fact of his prior representation of Mr. Williams. We submit that the record tells a different story. And critically, even with this Court to disagree with us on the... But the magistrate judge and the district court found against you on this point. Yes, Your Honor. So your Kyler claim fails unless you persuade us that that finding of fact about the attorney's knowledge was clearly erroneous. Yes, Your Honor, and we submit that it was clearly erroneous. As we discuss in our briefs, we think that Mr. Sullivan's testimony was internally inconsistent. We think that portions of it were illogical. And we think that when viewed in light of the factual record taken as a whole, including how he defended the case and how the choices that he made as counsel... The representation had occurred many years before, right, seven or eight years earlier. It had, Your Honor. And I assume for this, this is a high-volume practice. This lawyer probably would have represented hundreds of clients over that time period. That was his testimony, Your Honor. And we understand that that was something that the district court relied upon, but we think that actually, particularly in light of his large case volume, it was unreasonable of him to not run complex checks. And his testimony about whether or not he ran complex checks is unthinkable. There was actually no connection between the subject matter of his earlier representation and the representation in this matter, was there? The lawyer's representation. I believe that there was some connection in that the crimes were factually similar in certain respects. And in light of the fact that he would have gained information through that representation, that he perhaps could have used in cross-examining Mr. Williamson and P.J. I understand your position, and there's, of course, some dicks that are of a different opinion to the effect that it's an automatic conflict where he's previously represented a witness. But as far as any actual conflict, is there one, any continuing duty to that prior client that would create an actual conflict? I believe there is, Your Honor. I think that the duty of loyalty and the duty of confidentiality does not terminate with the death of the attorney-client relationship. It does not? Does the duty of the attorney to the client, once the case is over and he represents them, extend to matters that happen after the representation? I understand fully the duty as to, for example, communication within the time of representation, that that confidence extends until the death of the lawyer and beyond. But as far as the duty of loyalty as the freestanding duty, is there one with respect to matters that occur after the representation has ceased? I believe there is, Your Honor. I believe that in cases What's the source of that belief? I believe that there is case law, and I believe that the D.C. professional rules would have constrained Mr. Sullivan's representation at that time. It is possible that I think, as Your Honor suggests, the conflict of interest may have been waivable. We're not suggesting that it wouldn't be waivable. It is certainly waivable. We think that it would have been waivable, but it needed to be raised, and it simply was never raised. And I think that, again, the volume and nature of confidential information that he might have gained through that attorney-client relationship, which, again, lasted for more than a year, involved taking the case to the eve of trial multiple times, and then ultimately securing a very favorable plea bargain on behalf of his client, presumably did enable him to gain a lot of confidential information that he was then able to use, or that he would have been able to use in cross-examining Mr. Williams and, again, in casting him as the alternative perpetrator under the defense theory of Mr. Johnson's case. To prevail on your claims, do you have to make some showing about that the alternative defense theory had at least enough heft to it that it raised reasonable questions that could have influenced the outcome of the case? I believe the test under Kyler is whether there is a legitimate strategy that was not pursued because of the conflict of interest. And I think, Your Honor, that the record is clear that in this case, Mr. Sullivan did fail to undertake very basic steps that, candidly, we think any competent attorney would have undertaken, that would have been inconsistent with Mr. Williams's interests. Well, does it qualify as a legitimate strategy under that test, given that even if someone had been able to impeach Mr. Williams much more vigorously than occurred here, you still had three other witnesses who told the same version of events as Mr. Williams, and you had some pretty powerful forensic evidence that seemed to contradict the client's theory of the defense. Your Honor, we disagree with the assessment of the strength of the forensic evidence. We actually think that the state's physical evidence was very weak. They never had a murder weapon. There were no fingerprints that directly linked Mr. Johnson to the crime. No, no, no. I'm talking about where the bullet, the angle from which the bullet came in, the two shots came in, which is fully consistent with what all four witnesses, and even if we take Mr. Williams out, three witnesses testified and it seems to be nigh impossible to have happened through a fight in the backseat of the car. I think that if you look at, I think, Dr. Germaniak's testimony, that actually casts some doubt on that. Dr. Germaniak conceded that he had no way of knowing what position Mr. Nash was in at the time that he died. He could have been turned around. He could have, there just was simply no way to know. But it's undisputed that Nash, Keith Nash, was in the driver's seat. That was undisputed. And Victor Williams was in the far right-hand backseat of the car. Yes, that's correct. So if Williams, if this altercation started not by Johnson trying to rob Nash, but Williams trying to rob Johnson with the gun in the back right of the car, and you have an entrance wound on Nash's head, left side, three inches away, that's pretty hard to understand how that could have happened on Johnson's account. I'm not certain it is, Your Honor. If you believe the defense theory of the case, there was effectively a conspiracy among the other members of the car to hold up Mr. Johnson at gunpoint for drugs or money. And it is entirely plausible under that theory of the case that the person who kind of was involved in bringing this situation to where it was and driving the car to its final destination at the end of an alley, which, by the way, was right by Mr. Williams's house and substantially out of the way from where Mr. Johnson was coming from and purportedly going, that he would turn around if there was a struggle and things began to not go as planned. And in turning around, he might have exposed the left side of his head to the right corner of the backseat. I don't think that that is an altercation. Do you think a driver in that situation would turn to his left rather than to his right? I think it's possible that he would, particularly if Mr. Johnson were trying to lead the car through the back driver's side door. But critically, Your Honors, even if you disagree with us on the Kyler claim, we do think that the record establishes that Mr. Johnson is entitled to relief. Sorry, if you disagree with us on the Kyler claim, we nevertheless think that Mr. Johnson is entitled to relief on the Strickland claim because there were at minimum. Which claim? The Strickland claim, Your Honor, because there were, at minimum, very plausible theories that we think that if they had been properly developed, would have withstood a reasonable probability assessment. The Strickland claim is even harder for you on the issues we've just been discussing, right? Because Kyler is prejudice light. You only have to show that the attorney's performance was somehow impacted. Strickland is prejudice, and that's a moderately high standard. So if the difficulty for your side of the case is all of this other independent evidence against Johnson, your case gets harder when you move from Strickland, from Kyler to Strickland. We understand that the prejudice inquiry under Strickland is more demanding than the adverse effects inquiry under Kyler. But ultimately, we think that if you do step back and you look at the quantum of the state's evidence, this is not as easy a case as it appears at The witnesses did, for reasons that were unknown to the defense prior to trial, have interlinking motives to testify similarly. The physical evidence was not conclusive. And additionally, Your Honor, we submit that had Mr. Johnson been counseled properly by his trial counsel about the state's physical evidence, he may not have testified the same way. It is possible that he wouldn't have testified with the same scope. And it is, I think, possible that the defense could have developed its own physical evidence or found better ways to explain the physical evidence than were, in fact, offered at the trial had adequate pretrial investigation been conducted. And that was not done here. And that gave rise to reasonably plausible ineffective assistance. If he doesn't testify, then the lineup is 4-0 against him instead of 4-1 against him, in terms of what the witnesses say. Let's see how that helps him. I'm not sure that we're saying that he wouldn't have testified at all. But I think he certainly would have been better prepared. I mean, Mr. Johnson was a 17-year-old kid who had this very traumatic thing happen to him. Trial happened, I believe, nine months afterward. And I do think that it is more than plausible that his counsel could have helped him reconstruct and remember the events of the evening in a way that was more helpful to the defense case, certainly without overstepping his boundaries as an officer of the court as well. So we think that for those reasons, there was, at minimum, an adverse effect because he effectively failed to vigorously pursue the defense theory of the case. And we think that that is clear from the trial transcripts. And then we contend that by doubling down on his trial-level failures on appeal and by failing to kind of exploit the weaknesses in the discovery that the defense received from the state, he rendered ineffective assistance under Strickland on appeal as well. Can I ask you a quick fact question? You talk about the 1994 arrest of Mr. Williams shortly before trial, and there was no paper. Is there any evidence in the record or public record evidence, whether it was the same prosecutor that was prosecuting Mr. Johnson? There is no evidence in the record of that, Your Honor. And I'm not sure that those facts are available to us, in part just because of the amount of time that has passed. But we do think that it would have, nevertheless, provided credible evidence of bias upon a defense proffer to that effect. I see that I'm over time, so I will. Thank you very much. Good morning, and may it please the Court. Sharon Sprague on behalf of the United States, representing Warden Eric Wilson. The district court here did not clearly err by finding that Judge Sullivan did not recognize Mr. Williams as a former client. And that is the threshold inquiry that's critical, and it puts an end to the Kyler argument. The appellant here is really raising the same arguments that were made in the district court about Mr. Sullivan's credibility, Judge Sullivan's credibility. And all of those challenges were extensively, thoroughly, and thoughtfully examined by the district court, first in the 84-page report by the magistrate judge, and then in a 17-page opinion, reviewing it all by Judge Boasberg. Appellant also, at that point, there's a procedure, of course, in place to register objections to such a report, and then a procedure for the district court judge to look at those challenged points more closely. And in that challenge, I believe there were only three things that appellant identified. So that's what Judge Boasberg focused on. But in the end, he also adopted the entire report. In that report, and their conclusion was that Mr. Sullivan's credible testimony was that he did not recognize him at trial. And in fact... Is it ineffective to have... Is part of the ineffectiveness, at least, that he had no conflict check process? Well, that question was thoroughly examined, and I would say in this context, the answer is no. Because perhaps that would be relevant to a general Strickland ineffectiveness test. It just struck me as... I was rather shocked that he had no... I guess we have computers now. Well, sadly... We had paper back then, and we had... We did. And we had files. And lawyers and law firms have managed to check for conflicts for long before computers came along. And the notion that he did nothing other than go with his memory, which would seem to be profoundly flawed in this regard. Maybe he's too busy to have that memory. But it's deeply troublesome that he had no... He made no real effort to check for conflicts. Isn't it? I think that's very troublesome. Well, I think that we have to put ourselves back in that context. And sadly, I was practicing in that courthouse in those years, trying these cases. But there was no... It was not irrational. And both Magistrate Judge Harvey and Judge Boasberg agreed with us that he would not have conducted a particular conflicts check. That he would not have a system in place. He did have not just hundreds of cases and thousands of cases, but this case was 8, maybe 10, 8 to 10 years before Mr. Johnson's case. And it wasn't... It didn't go to trial. It was a plea. And interestingly, there's no evidence... In fact, there's evidence, suggestion in the record, that Mr. Williams didn't recognize Mr. Sullivan. Now, Mr. Williams didn't have hundreds and thousands of cases. Well, one of them has a professional obligation here, right? Correct. Mr. Williams didn't. And so, it's just still... It may not change the fact that he didn't actually know about the conflict, which is what... Which I think is the lynching. Yes, but it struck me as whether there's sort of an overarching question here, whether that itself was ineffective. Well, his professional obligation was explored, of course, in response to a Bar Council complaint on this very topic. And it was also explored by Judge Cannon when the fourth 23-110 was presented to him in the Superior Court. So, I think it has been quite fully explored. But either way, Appellant argues in their brief that the fact that he didn't have a conflict checked of the kind that we would like to see, perhaps, means that he can be believed... More than we would like... I just want to be clear. This is more than we would like to see. This was far below what one would expect from attorneys. Certainly, now, in terms of the mechanism for doing a conflict check, I would agree with the Court completely. But the point is that he... Appellant's argument is that if he didn't... Because he didn't have that conflict check, we can't believe him that he didn't know, that he didn't recognize Judge Sullivan and recognize Mr. Williams. And there's a clear fallacy in that argument. Because whether we think he should have done something differently or not, that only supports the notion and the factual finding made by Judge Boasberg and Judge Harvey that he did not, in fact, recognize Mr. Williams. In any event, even if you disregarded his testimony, even if you concluded that it was not credible at all, to this day, Appellant has not explained how anything that happened at the trial, anything Judge Sullivan did or did not do, was because of... Let's just call him Mr. Sullivan because he was not a judge at the time he did this trial. I don't want anyone to be confused. Oh, okay. I'm sorry. So let's just refer to him as Mr. Sullivan, please. I'm happy to do that, Your Honor. It's just a habit. I'm sorry. I think, you know, they had never explained how any of the alleged deficiencies were the product of this divided loyalties. Well, I think they have in the sense that he did not do anything. Mr. Johnson's theory was, it wasn't me, it was Williams, Mr. Williams. And among the long list of objections they have to what Mr. Sullivan did was that you didn't do anything to investigate Mr. Williams in a way that would allow you to be much more aggressive in cross-examining him and bringing information out. And then you... It may not just be that one thing, but they get to say there's a cumulative effect here of a number of errors. And you combine that with the fact that we didn't know about incredibly powerful impeachment evidence in their view, like the 1994 no paper and just a couple weeks before trial and the nature of the prior conviction. And then a long list of other objections to Brady evidence that wasn't disclosed or was disclosed in a very late time. And what I'm wondering is, it seems to me that it's not quite right to say that they haven't shown what the problem is. I think they say there was this conflict and that might have made that aspect even worse. And then when you mix it in with all these other problems, how can anyone have confidence in this verdict? They certainly assert that those things happened. But those challenges, those allegations were thoroughly examined by Judge Harvey and Judge Boasberg, who concluded that they were overstating the evidence and misstating the evidence. I hate to use that characterization in a court, but that's what Judge Boasberg said, that this was an overstatement. And Judge Harvey, this was an overstatement of the evidence and ignoring certain other evidence in the record. So the testimony was not that he did nothing. The testimony was, this occurred 20 years ago, and I don't remember the details of this particular case, but let me tell you what I would do in my normal cases. And he lays out, you know, investigative things that he would have done and he would have had his investigator done. If he'd done his normal things, would he have discovered that he represented one of the key witnesses? It would have been a little hard to miss that, wouldn't it? He would have gone and got his criminal record and pulled it up and seen it. It's hard to say. I mean, he was given, at that point in time, you wouldn't know who represented the person until you got the hard copy file, and that took two weeks to get, you could find. I have not been a criminal defense attorney, but I assume they do more than just go, oh, here's a conviction. When they find a conviction, particularly a robbery conviction, that, and this is a case involving who did this robbery, which in theory instigated this situation, at least under one theory, and they would look into it. Well, and all of those convictions were ultimately disclosed at trial or before trial. So there's nothing about any convictions that have not been, was not adequately disclosed. And once those are disclosed, the defense can investigate those things as well. What about their argument that it was too, much of the stuff was, not everything was disclosed, like the 1994 no papering, but as to the things that were disclosed, like that conviction, what is your response to their argument that it was too late at that point? There's no indication in the record that they did any, that anything happened to stop the trial and do any additional investigation. And Judge, excuse me. Well, that's my point. Mr. Williams wasn't doing the investigation. No.  Mr. Sullivan. But Mr. Sullivan explained exactly why he, why he did what he did. And the court found, both Judge Cannon and the D.C. Superior Court affirmed by the DCCA, and then again now in our district court, that, that it was not, his approach was not irrational. The, and it made sense. There was very little use that could have been made beyond what was made. It was those convictions were valuable for impeachment, but the factual details of them would not have been admissible. What about the 1994? Yeah, I was about to address that if I could have another minute or so. You agree there's just nothing in the record. We have no way of knowing that it was the same prosecutor or not, or do we? We have no way of knowing. I think one thing that I do want to remind the court is that when a case like that is no paper, it's no paper at that moment, you know, when, when the police bring the, the arrest information to the prosecutors to decide what to do with it. So the prosecutor's office, my office, decided not to prosecute. But there is, if there had been some sort of link between that decision and Mr. Williams' testimony sometime later, appellant could have been able to show that, I think, by now. But there, there has been no explanation. There's no, there's been, there's no showing of any promise by the government to go easy on him. They just didn't want, they didn't want their witness coming in and having to admit that he was under prosecution at that very time. Was that also a robbery? There is nothing in the record to suggest that, that the person that the, that part of the office who decided not to paper this case, in other words, that it wasn't. No, there's nothing to suggest because it wasn't disclosed to them. And so no one, this, this was not disclosed at all. This wasn't a late disclosure, wasn't disclosed at all. And so no investigation was done. To the extent. Until way too late. The only way in which this is relevant is it would potentially go to bias, right? We understand that context. So if, if, if the government wants to hold an arrest over a, over a witness's head in order to testify, we know how to do that. And it's not by dismissing their case before anything happens in the case we want their cooperation. Well, again, there's two ways to do it. One, that's one approach. Another would be, we just don't want to mess up his, we don't have, want him to have more of a record when he comes in to testify. That's not holding anything over his head. Well, that's an interesting theory, but that would mean, I think, Your Honor, that we couldn't, that would fly in the face of a lot of case law that talks about mere arrests not being relevant compared to convictions. It's not case law. This is just what some attorney would be able to argue. That's all. Yeah. Had the Brady evidence been disclosed. Well, the case law that I'm referring to is what's admissible and what isn't admissible. So you can't argue things that aren't admissible. And I think for that reason that Judge Boasberg made a, his finding that Judge, that Mr. Sullivan's decision making and his strategy was a sound one. And did not rise to the, you know, very tough standard of ineffective assistance, which of course, you know, we know how much deference is given to strategic decisions and to, there's a wide range of acceptable representation. So there's nothing to suggest that those conclusions should be overturned here. And more importantly, as both those judges in the district court recognized, there were so much other evidence. It was a strong case. There were three eyewitnesses. The forensic evidence completely lined up. And, you know, I think, I think it's much more likely, but that someone would, in the driver's seat, would turn right to look in the backseat than to turn left. But all of that, that I just heard in that part of the argument is speculation and inappropriately considered. I urge the court to affirm the denial of the petition. Thank you very much. I think Ms. Sterling was out of time. We'll give you two minutes. Thank you. Did you have any impeachment evidence or do any of your Brady claims or insufficient investigation claims pertain to Sharon Nash? Yes, Your Honor. Ms. Nash was carrying a gun the night of the crime, and she tried to give that gun to her brother. She claimed that it was so that he could reasonably defend himself against an armed attack. Is that a Brady? You knew that. This isn't a Brady claim, is it? I don't believe the defense did know that prior to trial. I believe that Sharon Nash's testimony at trial was a surprise. And I think that had the defense been in the possession of that information before trial, they would reasonably have been in a position to deal with it. Were you given a timely disclosure of the witness statement? Correct, Your Honor. Were you given a timely disclosure? The record is unclear as to when exactly the defense learned about it. It's pretty important for you to have a claim. I think, Your Honor, that we have no record of it being part of any Brady or Giglio disclosures. It was not in the materials that we received from the government. It is not in the client's case files. And Mr. Sullivan did not appear prepared to fold that into the defense theory of the case at trial. And we think that that's very important because I think had the defense accounted for that information properly in its kind of theory of the case, I think the fact ultimately supports the notion that there was a broader conspiracy among the members of the occupants of the vehicle. And that Sharon Nash was part of that. But critically, there's no way that Mr. Johnson could have known about that. And if I could just take a moment to correct the record on a couple of other issues that I believe came up during the government statements. The 94 arrest was on felony robbery charges. Again, it was no paper. And the only intent that matters for purposes of that, it's not the prosecution's intent that matters. It is the witness's. It is the effect on the witness and his motivation to curry favor that matters for purposes of the impeachment inquiry. Additionally, for purposes of Brady and the belated disclosures, the fact that counsel did not seek a continuance is irrelevant because it is not uncommon for little pieces of information to come out of trial. That counsel is unable to appreciate the significance of in real time. Finally, your honors, I would like to focus this court's attention on the only prejudice inquiry that really truly matters for purposes of this appeal. And that is the prejudice that Mr. Johnson sustained with respect to his direct appeal. This court does not need to stand in the shoes of the Court of Appeals and conclusively decide whether Mr. Johnson would be entitled to relief under Brady or Giglio or for ineffective assistance of trial counsel. That is for the D.C. Court of Appeals. But I think the question is, should these claims have been raised on appeal? Why not, though? Your theory before us is ineffective assistance of appellate counsel. Yes. For failure to raise Brady claims and ineffective assistance of trial counsel claims. That failure can't be ineffective if those underlying claims lack merit. It is true that you have to look to the merits of the underlying claims to decide it, but you don't need to decide by a preponderant standard that they're likely to succeed. That, in fact, would be inconsistent with the prejudice inquiry under Strickland, which requires only a reasonable probability that a claim be likely to succeed. Would make a difference. Yes. Yes, your honors, that's correct. It's reasonable probability squared, right? Reasonable probability that the D.C. Court of Appeals would have found a reasonable probability. Exactly so, your honor. And can we be confident, given that these issues, which I think are troubling, are very troubling, were not raised on appeal. Can we be confident that Mr. Johnson received a fair shake on appeal? And we submit that the answer is no. All right. Thank you very much. Thank you. Case is submitted.
judges: Millett, Katsas, Sentelle